Scott M. Riemer (SR 5005)
RIEMER & ASSOCIATES, LLC
Attorneys for Plaintiff
60 East 42nd Street, Suite 1750
New York, New York 10165
(212) 297-0700
sriemer@riemerlawfirm.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
LAURIE TIETJEN,

                Plaintiff,

     vs.

UNUM LIFE INSURANCE COMPANY OF
AMERICA,

                Defendant.
----------------------------------------------------------X

Case No. 16-CV-7021

**COMPLAINT FOR BENEFITS
UNDER AN EMPLOYEE
WELFARE BENEFIT PLAN**

     Plaintiff LAURIE TIETJEN (hereafter "Plaintiff"), by her attorneys, Riemer & Associates, LLC, complaining of Defendant UNUM LIFE INSURANCE COMPANY OF AMERICA ("UNUM"), alleges as follows:

     1.    This is an action arising under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.*, to recover benefits due under an employee benefit plan, to clarify the rights of Plaintiff to future benefits under such plan, and to recover attorney fees and costs.

     2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and 29 U.S.C. § 1132(a), (e), (f), and (g), of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101, *et seq.* (hereafter "ERISA") as it involves a claim by Plaintiff for disability

benefits under an employee benefit plan regulated and governed under ERISA.  Jurisdiction is predicated under these code sections as well as 28 U.S.C. § 1331 as this action involves a federal question. Pursuant to 29 U.S.C. §1132(f), this Court has jurisdiction without respect to the amount in controversy or the citizenship of the parties.

3.      Venue is proper in this District, pursuant to 29 U.S.C. § 1132(e)(2), because the Plan as hereinafter defined was administered in this District.

4.      The ERISA statute at 29 U.S.C. § 1133, in accordance with Regulations of the Secretary of Labor, provides a mechanism for internal appeal of benefit denials.   Those administrative avenues of appeal have been exhausted.

## PLAINTIFF'S PARTICIPATION IN THE
## LONG TERM DISABILITY PLAN

5.      Plaintiff is informed and believes and thereon alleges that the Time Warner, Inc. Plan ("Plan") is an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1), that is established and maintained by Time Warner, Inc., which serves as the Plan Administrator, to provide its employees, including Plaintiff, and employees of its subsidiaries and affiliates with income protection and continued life insurance coverage in the event of a disability.

6.      Plaintiff alleges upon information and belief that Defendant is, and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of Tennessee.

7.      Plaintiff  alleges upon information and belief that Defendant is, and at all relevant times was, the insurer and Claims Administrator for the Plan within the meaning of Section 3(16)(A) of ERISA, 29 U.S.C. § 1002(16)(A).

8. At all relevant times, Defendant has been a fiduciary within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

9. At all relevant times Plaintiff was a resident and citizen of the United States, an employee of Time Warner, Inc., its successors, affiliates and/or subsidiaries, and a participant in the Plan within the meaning of Section 3(7) of ERISA, 29 U.S.C. § 1002(7).

10. Based upon information and belief, Plaintiff alleges that at all relevant times she was covered under group disability policy number 567843 001 (attached hereto as Exhibit "A"), which were issued by Defendant UNUM to World Vision, Inc. to insure its Plan, and the eligible participants and beneficiaries of the Plan, including Plaintiff.

**STANDARD OF REVIEW**

11. The appropriate standard of review is *de novo*.

12. UNUM engaged in intentional and harmful ERISA procedural violations; violations of its obligations under the Regulatory Settlement Agreement ("RSA") as referenced in *In the Matter of Unum Life Insurance Company of America, Targeted Multistate Disability Income Market Conduct Examination*; and violations of its own policies and procedures as set forth in its claims manual, which are the hallmark of failure to provide a "full and fair review."

13. UNUM's violations were neither inadvertent nor harmless to Plaintiff.

14. UNUM's violations trigger *de novo* review under *Halo v. Yale Health Plan*, 819 F.3d 42, 45 (2d Cir. 2016), which holds that *de novo* review is appropriate where a fiduciary fails to follow ERISA's claims regulations and such failure was neither inadvertent nor harmless.

15. Here, UNUM's violations include, but are not limited to: (a) failing to provide medical consultants in the correct specialties to review the medical records in the claim file; (b) relying on a non-examining neuropsychologist to deny a claim supported by the treating

3

physician; (c) failing to assess the claimant's regular occupation, as defined in the Plan, to include both exertional and non-exertional or cognitive demands; (d) relying on the opinion of a physician consultant to uphold the denial, when said physician consultant's report includes factual errors and inaccurate internet "research"; (e) failing to identify the medical and vocational consultants who reviewed Plaintiff's records; (f) failing to follow its own internal policies and procedures with respect to the "Self-Reported Symptom" limitation as herein after defined; and (g) failing to provide Plaintiff with a "full and fair review" as it was obligated to do pursuant to 29 C.F.R. §2560.503-1(h)(4).

## THE RELEVANT TERMS OF THE PLAN

16.    The Plan provides a monthly long-term disability ("LTD") benefit equivalent to sixty percent (60%) of Plaintiff's Monthly Earnings, to a maximum benefit of $20,000, less Deductible Sources of Income, including Social Security Disability benefits.  Plan benefits are payable following a 26-week Elimination Period and continuing through the claimant's 65th birthday.

17.    The Plan defines disability in relevant part as follows: "You are disabled when Unum determines that: you are limited from performing the material and substantial duties of **your regular occupation** due to your sickness or injury; and you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury."

18.    The Plan further defines the terms used in the definition of disability: "Material and substantial duties means duties that: are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified.  Regular occupation means the occupation you are routinely performing when your disability begins. Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks

are performed for a specific employer or at a specific location."

19.    The Plan limits LTD benefits for certain types of disabilities: "Disabilities, due to a sickness or injury, which are primarily based on self-reported symptoms, and disabilities due to mental illness, have a limited pay period up to 24 months."  The Plan, however, excludes certain types of disabilities from this limitation: "Unum will not apply the mental illness limitation to dementia if it is a result of: stroke; trauma; viral infection; Alzheimer's disease; or other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment."

20.    The Plan defines "Self-Reported Symptoms" as "the manifestations of your condition which you tell your doctor that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headaches, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy."

21.    Upon information and belief, UNUM's internal claims administration policies and procedures dictate that the policy's limitation on "Self-Reported Symptoms" does not apply to claims arising from policies administered in New York.

## THE ADMINISTRATIVE PROCESS

22.    Plaintiff was at the maximum benefit level, minus her monthly Social Security Disability benefit, after she was found totally disabled from any gainful occupation by the Social Security Administration.   Unum paid Plaintiff LTD benefits from April 28, 2012 through February 27, 2015 only; claimant's 65th birthday falls on April 24, 2037.

23.    On May 15, 2015, Social Security Administration re-affirmed its finding that Plaintiff remains totally disabled from any gainful occupation.   Plaintiff continues to receive

Social Security Disability benefits to date.

24.     Prior to her disability Plaintiff worked as a Vice President, Strategic Communications and Branding for Time Warner.  In this position she was responsible for creating, managing and executing Time Warner's internal communications and branding strategy. Skill sets necessary for the competent performance of Plaintiff's Regular Occupation include, but are not limited to:  Judgment and Decision Making; Complex Problem Solving; Management of Financial Resources; Critical Thinking; Reading Comprehension; Time Management;  Effective Communication Skills (oral and written); Management of Personnel Resources; and  Operations Analysis." Plaintiff's Regular Occupation also required travel by car, train, and airplane on a frequent basis.

25.     Plaintiff became disabled, as defined by the Plan, on or about October 29, 2011, after being seen and evaluated twice in the emergency department over the span of four days for symptoms later attributed to the diagnosis of Lyme disease.  After a third emergency department visit, Plaintiff followed up with her primary care physician Dr. Bais, who documented that the patient reported a tick bite around October 23, 2011.  On November 7, 2011, Dr. Bais documented complaints of severe diarrhea, eye twitching, fatigue, and tingling and numbness in Plaintiff's hands.  Dr. Bais also wrote "R side back of head." The Impression/Diagnosis reads: "1. Paresthesias R/O Lyme."  Doxycycline was empirically prescribed.

26.     Dr. Bais completed Attending Physician Statement on or about November 17, 2011, documenting "Date of first visit for this current condition: October 25, 2011"; "Primary Diagnosis: Paresthesia"; "Secondary Diagnosis: Lyme."

27.     Plaintiff established care with Dr. Robert Bransfield, a Lyme disease specialist, on December 6, 2011. After an extensive symptom inventory and evaluation, Dr. Bransfield

diagnosed Plaintiff with Lyme/tick borne disease and possible Babesiosis. Dr. Bransfield's notes include Plaintiff's positive history of Erythema Migrans Rash and positive Recurrent Erythema Migrans Rash.  Dr. Bransfield recommended continued antibiotic treatment with doxycycline, added Zithromax, and prescribed Xanax for anxiety and Lyrica for Plaintiff's symptoms of paresthesia/dysesthesias Dr. Bransfield opined that the patient was unable to work.  Lab results from December 6, 2011 show elevated EBV and Parvovirus.

28.   On January 3, 2012, Dr. Bransfield responded to Unum's inquiry regarding Plaintiff's restrictions and limitations by opining that she "should not commute to work and should not do tasks requiring cognitive abilities, energy and wakefulness."  He noted that these restrictions began in November 2011 and the end date was not determined.

29.   Due to a lack of symptom improvement after several months of ongoing antibiotic therapy, Dr. Gaito, who specializes in Rheumatology, evaluated Plaintiff in late February 2012 and changed the generic Doxycycline to Doryx.  In late March 2012, Dr. Fein, a second Rheumatologist, diagnosed Plaintiff with Lyme Encephalitis and initiated therapy with IV antibiotics (Cetotaxime/Cettriaxone) and Tindainax "for cell wall deficient forms of Lyme disease."

30.   Plaintiff continued to treat with Dr. Fein and Dr. Bransfield.  Blood work was continuously tested and continually showed abnormal findings. The patient reported, and her treating physicians documented, ongoing symptoms including: Severe fatigue - can do very little - short duration of activity only possible; Increasing cognitive symptoms; Visual problems; one pupil not dilating; Dizziness; Weakness; Muscles twitching; and Difficulty concentrating.

31.   Plaintiff submitted a letter from Dr. Fein dated March 29, 2012 outlining how Plaintiff's diagnosis of Lyme disease was made, the symptoms and functional limitations that

Plaintiff was experiencing, how this condition was being treated, and offered several explanations for the rapid progression of the disease and the seemingly poor response to therapy. Dr. Fein concluded the letter with "This patient will require intravenous antibiotics, serotonin enhancement, bed rest and possibly cognitive rehabilitation before any assessment of functional capacity can be determined.  She is currently totally disabled. The anticipated duration is 3-6 months."

32.    On April 6, 2012, at the request of Unum, Plaintiff submitted a description of her Regular Occupation prepared by a hired consultant.  The document included the following statement from Plaintiff: "Please know that I want so badly to return to work. I have never been sick like this in my life, and it is devastating to me that I am unable to continue in my role at this time. I have worked so hard to achieve the level of vice president in multiple Fortune 100 companies prior to turning thirty years old. My work ethic and drive to succeed is part of who I am in both my professional and personal life.  I hope this job description helps you understand how my medical condition restricts and limits my ability to work. … Please understand that writing this letter was a battle. It took me hours, over days, to write. And even then, I could have never have done this without much help and assistance from my family and friends. This fact is heartbreaking to me, as writing and words are what I have built my career upon."

33.    Unum approved Plaintiff's LTD benefits in April 2012.

34.    Despite the medical evidence In June 2012, Unum's on-site physician, Dr. William B. Fox, Internal Medicine reviewed the file and opined that "the claimant's multiple somatic complaints in the absence of clinical findings do not in and of themselves support a diagnosis of Lyme disease."  Dr. Fox wrote to Dr. Bransfield to gain a better understanding of Dr. Bransfield's medical opinion. Dr. Bransfield responded on July 19, 2012. He replied that he had

observed Plaintiff's Erythema Chronicum Migrans (ECM) rash on two occasions (12/6/2011 on the back of the neck by the hairline and 5/1/2012 on the forehead). He additionally wrote: "Unable to meet job description as a result of the following: Disabling fatigue, multiple cognitive impairments, frequent medical appointments, episodes of muscle tremors, episodes of impaired gaits impacting coordination, impaired ability to read or write, episodes of sweating and chills, low stress tolerance, very poor endurance." Dr. Bransfield added, "Note: incorrect statement in your 7/2/12 letter, my statement based upon on my exam not primarily on her reports" and "Question: how many active Lyme/Tick borne disease patients do you personally treat? Regardless the issue isn't the diagnosis. The issue is the level of impairment. Patient is severely impaired."

35.   Dr. Fein also responded to Unum's on-site physician, Dr. Fox's inquiries On August 3, 2012 with the following: "I have received your July 2, 2012 letter requesting information on Plaintiff's case. You labeled Plaintiff's physical and cognitive complaints as being somatic and only attributed to a diagnosis of Lyme disease. Your characterization is mistaken. Plaintiff's complaints are not somatic they are in fact caused by an active Lyme disease infection. … I'm also unclear when you refer to Plaintiff's occupation as the VP of Employee Communications and Branding but then label her job as a communications manager in your next paragraph. My understanding is that she was a Vice President of Time Warner in an extremely demanding executive position. I have spoken with Plaintiff and have an understanding of her job duties. Her inability to perform her occupational duties is based on her actual work not the oversimplification of her position to a communication manager."

36.   Dr. Fein responded to Unum's questionnaire as follows:

<u>What physical exam findings support assessment that Plaintiff is "totally disabled" and unable to perform the occupational duties delineated above</u>?

- Patient was regularly in tick infested areas.

- Physical symptoms identified in notes from March 29, 2012. Light/sound/touch sensitivity, confusion. No pupillary reaction to light, loss of balance, profound exhaustion, strongly positive Romberg sign, bilateral knee expressions, Adies pupil.

- Physical restrictions include treatment demands of IV antibiotics, bed rest, fatigue, sleep disorders, memory cognitive dysfunction resulting in total disability.

<u>What diagnostic test findings support assessment that Plaintiff is "totally disabled" and unable to perform the occupational duties delineated above</u>?

- Clinical diagnosis based upon history and physical exam, hematology confirmation by positive Lyme IgM Western blot, elevated ESR.

- The symptoms listed above plus treatment protocol render her totally disabled."

37.    On December 12, 2012, Unum required Plaintiff to attend an Independent Medical Evaluation by Dr. Alan Lichtbroun.  He opined that Plaintiff "certainly would be unable to fulfill the requirement of her job description." He also noted "…In walking into the exam rooms he [sic] is unstable and has to hold on to her husband as well hold on to the table before she sat down on the exam table. I definitely do not think this is show and feel that she is having severe cognitive and balance problem which is seen in fibromyalgia but not to this extent. There is [sic] elements of encephalopathy here."

38.    Dr. Lichtbroun reviewed a picture of a rash that had been on Plaintiff's neck and

concluded that it was "compatible" with a classic bull's eye rash. Dr. Lichtbroun wrote: "I personally feel that there is another medical condition producing her symptoms but at this point I do not know what it is. She does have mild fibromyalgia but her symptoms are much more severe than I would expect just with the diagnosis of fibromyalgia. An MRI of her brain was not done and I questioned her why she did not see a neurologist and have a spinal tap. We always do spinal taps on patients who may have neurologic Lyme. It is surprising that her other consultants did not recommend this. …If we believe that the rash was on her occiput was a classic bulls eye and we believe that she has some immunocompromised that she did not form on IgG reaction as other people usually do, Lyme can give you encephalopathy."  Dr. Lichtbroun added, "Easy question here however is the fact that she is certainly disabled and completely disabled from returning to the occupation that she had for the past 6 years as she is still unable to ambulate because of her balance. She still has severe fatigue and major cognitive difficulties which are improving."

39.    Unum asked its examiner, Dr. Lichtbroun, to prepare an addendum to his exam report to clarify whether or not he had performed a comprehensive physical examination of the claimant, as there is no documentation of an abdominal or a neurologic exam. Dr. Lichtbroun's response, dated January 17, 2013, states:  "We did do a neurologic exam on Mrs. Tietjen Her sensory exam was completely normal and even our cursory motor exam did not show any obvious weakness. She did however have marked balance problems and it was difficult for her to do Romberg test for any extensive time. She had thumb twitching intermittently. … The balance is significant in that that is one of her major complaints that it makes it so difficult for her to return to work. I understand that she is working on the abnormal Romberg test at physical therapy and in fact speaking to her prior to these questions, she tells me that she can now stand

for 25 seconds without opening her eyes arid not falling. This used to be only a few seconds prior to physical therapy."   He also wrote: "Question of Lyme disease. At this point, I am uncertain. The blood tests do not certainly confirm the disease. The rash however looks significant and according to her, classic for Lyme. As you will see, we are waiting for a full immunologic workup that she recently had by the immunologist in Newark, Dr. Tina Zecka. If she is immunocompromised. i.e. has low lgG that would explain her whole syndrome that she would be unable to make an antibody response to the Lyme as well as develop a worse condition including encephalopathy."   Further, Dr. Lichtbroun wrote: "She is unable to fulfill the requirements of her job description mostly because she cannot walk let alone drive because of her balance as she has severe fatigue. She has encephalopathy so her brain 'shuts down.' She is unable to read a book now for more than a few minutes. She certainly would be unable to compose a speech for a CEO. She is more light and sound sensitive. It is difficult for her to accommodate for loud noises. Most importantly, she is so fatigued it would be difficult for her to work on entire day."

40.   Plaintiff continued to follow up for her medical conditions with Dr. Fein. Dr. Fein's office visit notes continued to document ongoing and new symptoms including seizures, severe fatigue, face parenthesis, light sensitivity, bilateral knee effusion, cognitive difficulties, and sleep difficulties.   Plaintiff developed shingles in March 2013.   Lab results continued to show abnormal findings.

41.   In October 2013, Plaintiff established care with Dr. Zimmerman. Office visit notes document her ongoing symptoms.  In January 2014, Dr. Zimmerman documented the following: "+ Mycoplasma, + Lyme 2012, + EBV, + Parvovirus, + Babesia FISH. Plan: Chronic Lyme and acute exacerbation; IVIG infusion per neuro and then try to get IV Zithromax."

42.   In November 2013, Plaintiff underwent a consultation with Neurologist, Dr. Grewal, who documented exam findings of mildly impaired short term memory, unsteady gait, balance, impaired Romberg. Dr. Grewal's report dated November 5, 2013, states: "Neurological examination - 1. Mental status - she has some complaints and difficulties with short term as well as long term memory. She is clearly not as sharp and as functional as she was before. 2. Cranial nerves II through XXI: show that she has a mild degree of nystagmus on extreme gaze to either side. 3. Reflexes are +2 and symmetrical with downgoing toes. 4. Sensory examination is normal to light touch, pinprick vibration and proprioception. 5. Motor examination shows that she has muscle tenderness in the proximal portions of her shoulders and mild weakness 4/5 involving the proximal muscle groups. 6. Cerebellar functions normal. 7. Gait, she is not able to walk on her heels and toes and has positive Romberg test."   Dr. Grewal wrote under the heading "Impression": "From a neurological perspective she has evidence of both central nervous system as well as peripheral nervous system involvement. Some of the neurological complications of infectious disease can include CIDP [Chronic Inflammatory Demyelinating Polyradiculoneuropathy] and myositis."

43.   On December 4, 2013, Plaintiff underwent an EMG.  The report noted, "The findings on this electrophysiologic study are equivocal but could suggest a mild myopathic process."

44.   In a letter dated January 27, 2014, Dr. Fein wrote a letter to Unum supportive of Plaintiff's disability due to a physical condition that would not be considered "self-reported." Her letter states: "I have been asked to write a letter to serve as a rebuttal to the attestation made by her Insurance carrier that she is in fact, not disabled beyond 24 months of benefits because all of her symptoms and manifestations are 'self reported.' This of course is not the case her

symptoms and manifestations are all supported by objective evidence."  Dr. Fein further wrote There are many articles written regarding the criteria for the diagnosis and treatment of Lyme disease. There is no consensus. All of the articles. however, state that the presence of an erythema migrans rash at the onset of the syndrome is a hallmark of this diagnosis. This was the first objective sign that this patient had Lyme disease. She had a large buIIs eye rash on her scalp in October of 2011. All articles also state that this rash in the setting of fevers and a progressive illness characterized by involvement of multiple organ systems is diagnostic of Lyme disease. This patient fulfilled all of the above criteria."  Dr. Fein further wrote: "While every effort to get this patient back to a normal level of functioning has been unsuccessful, it is not the fault of the patient or her treatment team. She continues to be unable to function in any work environment, particularly her prior high stress occupation. … Currently her physical and cognitive restrictions and limitations prevent her from performing hers or any gainful occupation. She suffers from extreme exhaustion, severe cognitive difficulties, including memory loss, difficulty finding words, confusion, seizure inability to read extensively, inability to function mathematically, gait disturbance, sleep disturbances, extreme sensitivity to light sound and touch, sweats, loss of balance, depression secondary to her physical condition. … How could she possibly go to work while suffering from all of the above symptoms? Her ability to return to work is an absurd suggestion. Stating that her disability is 'self reported' is even more absurd."

45.    Dr. Bransfield also submitted a letter in February 2014 in support of the diagnosis of Late Stage Lyme Disease. He lists the clinical findings supportive of the diagnosis as: + EBV; + Lyme WB Igm (12 bands); + Babesia; + Bulls eye rash; + findings of cognitive impairment after neuro psych exam; + Romberg sign; + arthritis; Tremors; + Lyme Elisa; + adies pupil; and + EMG.  Dr. Bransfield commented that this is "not a behavioral condition. She suffers from

14

severe cognitive impairment resulting from Chronic Late Stage Lyme." He added the following statement: "These symptoms are not only reported by Plaintiff, but have been confirmed by examination. Significant cognitive impairment (confirmed by examination & testing) profound exhaustion (witnessed on exam), light, touch and sound sensitivity (evidenced during examination), Gait disturbance (witnessed during examination), slow speech poor concentration (evidenced on examination) seizures (witnessed by Dr. Zimmerman during office visit)."   He wrote: "My patient Laurie Tietjen's disability is clearly supported by objective evidence and not based on self-reported symptoms. She cannot work in hers or any gainful occupation for an indefinite period of time."

    46.    Dr. Zimmerman also documented her medical opinion in a letter dated March 4, 2014. She wrote: "Plaintiff has had multiple systemic dysfunctions due to long standing infection with Lyme spirochetal infection as well as Babelosis coinfection. Ms Tietjen's disabling symptoms include disabling fatigue, headaches, migratory joint and muscular pain as well as chest pains palpitations and air hunger. She also has cognitive dysfunction with confusion, dysfunctional immediate memory recall and intermittent blurry vision. Other neurological symptoms include neuromuscular myoclonic seizures, numbness tingling and confusion. … These symptoms are reported by the patient and easily observed and documented on exam. She visibly has joint swelling and loss of range of motion as well as pain in multiple joints including hands, knees and spine, loss of ROM as well as pain and swelling. On exam patient has poor acute memory retention and must take notes with visible slowness to handwriting and requires repeating of simple instructions multiple times. On a recent exam patient exhibited visible fine tremors to both upper extremities and I witnessed a full myoclonic seizure which involved both upper and lower extremities and lasted well over ten minutes during which myself and a medical

assistant needed to support her body on the exam table as she had uncontrollable muscular myoclonic release. … Laurie has typical medical damage to multiple organ systems including neurological symptoms that have been documented by exam as to her memory lapses and fine motor tremors as well as seizures due to progression of her Lyme disease as well as immunoglobin deficiency, as documented by low IGg subclass antibodies measured on 4/12/13. She also has rheumatological swelling of multiple joints and loss of range of motion on exam as well as typical symptoms of co-infection Babesiosis of chest pains palpitations and air hunger and headaches. … Her condition has been well documented to be caused by long standing Borrelia (Lyme) and Babeosis infections. Both infections if not treated aggressively cannot be eradicated and go into a second stage and third stage of progression of damage and illness. Her condition is not "self-reported" and in fact is well supported by multiple objective criteria. … Clearly has neurological and immunological deficiency and autoimmune thyroid dysfunction due to the third stage of Lyme and Babeosis infection which causes severe damage that is difficult to treat and eradicate at this stage. The treatment of Lyme disease and co-infections such as Babeosis is complicated by inadequate diagnostic testing and short courses of antibiotics at the start of the infection which then causes the infection to create multiple systems damage and clearly Plaintiff demonstrates this progression of disease. … She will require a protracted treatment plan to limit the damage from her illness and has many disabling symptoms that are clearly documented on exam as well as labs. Her inability to work at any job description at this time is clearly documented and she has a long course of treatment ahead of her to attempt to recover some of her function if she responds to treatment. She will be on disability due to the severity of her disease progression for an indefinite period of time."

47.    Plaintiff also submitted to Unum a neuropsychological evaluation report by Dr.

Leventhal dated March 27, 2014, in order to clarify the cognitive issues she had been experiencing. Dr. Leventhal summarized her findings as follows: "Plaintiff's neurocognitive impairments, her visual processing impairment and her physical symptoms make it impossible for her to meet job related responsibilities. Her neurocognitive impairments would cause her to make errors, miss important information, miss deadlines, be unable to communicate necessary information to others, and coordinate events and presentations. She would surely be rated poorly in job performance. It's concluded on the basis of this evaluation and the severity of her neurocognitive impairments that at the present time Plaintiff is incapable of meeting the responsibilities of any job. It is clear that she would not have qualified for her past positions had her skill level that exist now been her skill levels prior to 2011. The impairments documented on this evaluation, despite good attention and impressive effort, are commonly seen in individuals with tick borne diseases. It is concluded that the results of this evaluation are compatible with a diagnosis of Lyme disease and more specifically Lyme Encephalopathy."

48.   On July 1, 2014, Unum's on-site neuropsychologist, Dr. F. William Black, opined that "Cognitive R&Ls [restrictions and limitations] are unclear. The etiology of the EE's reported and observed cognitive symptoms are uncertain. The validity of the cognitive results is questionable." Dr. Black's opinion was premised solely on the review of Dr. Leventhal's raw data and report; Dr. Black never examined Plaintiff prior to rendering an opinion.

49.   On August 13, 2014, Unum's designated medical officer, Dr. Gary Greenhood, reported: "discounting mental-and-nervous issues and self-reported symptoms, submitted information supports that the claimant is able to sit frequently and stand, walk, and exert up to ten pounds of force occasionally. … She is restricted from driving a vehicle, operating other forms of heavy machinery, riding a horse, or being exposed to heights in an unrestricted

fashion." Dr. Greenhood further wrote: "The claimant has myriad symptoms that include pain, fatigue, and impaired cognition. It is alleged that these are due to late-stage Lyme disease. It is further alleged that she has Babesiosis. However, neither of these infections is substantiated. There is a further implication of possible, on-going infection with Epstein-Barr virus (EBV) and Parvovirus. There is no substantiation of active infection with any microorganism. IgG titers to EBV and Parvovirus are elevated; this is consistent with remote, as opposed to recent or on-going, infection with these viruses. … My analysis concludes that the claimant's fatigue and pain are self-reported symptoms and not due to late-stage Lyme disease or any other infectious disease. The etiology of tremor, impaired gait, positive Romberg sign, and myoclonic seizure is not determined."

50. On January 12, 2015, Unum required Plaintiff to undergo two further examinations: a Neuropsychological evaluation performed by Dr. William Barr, who reported that the examination was not valid, yet somehow still opined Plaintiff is not disabled by any non-limited condition; and a Neuropsychiatric evaluation by Dr. Scott E. Hirsh.

51. Dr. Hirsch wrote in his Independent Medical Examination report dated January 12, 2015: "In my view, Mrs. Tietjen's symptoms and complaints are at least partially attributed to her psychiatric conditions. Her conditions very well may have started with somatic symptoms of Lyme disease but then excessive thoughts, feelings, and behaviors related to these somatic symptoms became associated with overwhelming anxiety, resulting in the Somatic Symptom Disorder. The subsequent accumulation of various losses has ultimately led to a depressive illness." Dr. Hirsch further opined: "Because the patient's neuropsychiatric illness was subsequently treated primarily biologically with agents without direct effect on anxiety and mood symptoms, the patient has not improved in a sustained manner. … Mrs. Tietjen's has not

had Video EEG monitoring to clarify whether she does in fact have epilepsy. At present, she is not adequately treated for epilepsy. Given the possibility of seizures, I recommend against any driving at all. … At present, the patient is not fit to return to work given the significant psychological distress she exhibits. However, I am hopeful that with aggressive psychiatric treatment and clarification of possible seizures, her level of functioning can be restored."

52.   Unum denied Plaintiff's LTD claim on February 26, 2015.  The denial letter states: "Decision/Reason: Benefits payable for disabling mental illness and self-reported symptoms have been exhausted as of April 27, 2014. Through recent evaluations we have determined that Plaintiff is not disabled by any other medical conditions. Because 24 months of disability benefit have been exhausted as of April 27, 2014 that were payable for her mental illness and self-reported symptoms, and she is not disabled by any other conditions, no further Long Term Disability benefits are payable and the claim has been closed."

53.   Plaintiff timely appealed the denial of her claim.  In support of her appeal, she submitted: updated medical records from Dr. Zimmerman; updated medical records from Dr. Fein; photographs demonstrating Adies pupil; an article published by Dr. Bransfield titled "The Neuropsychiatric Assessment of Lyme Disease"; and lab reports that include consistent abnormal results including, but not limited to: 1/7/15 – positive Lyme Disease IgG/Igm; 3/10/15 – positive ANA screen, ANA AB/titer and abnormal ANA pattern; 8/27/14 – positive Epstein Barr virus (EBV), EBV-EA IgG/IgM; 8/26/14 – sed rate 30 (normal 0-20);  4/15/14 – Positive Lyme IgG/IgM; 3/5/14 -  Positive Lyme IgG/IgM; 12/31/13 - Positive Lyme IgG/IgM; and 10/8/13 sed rate 51.0.

54.   Plaintiff also submitted, in support of her appeal, the report of vocational expert, Charles Galarraga.  The expert concluded Plaintiff is unable to perform her regular occupation,

which includes both travel and extensive, sustained cognitive functions.   Plaintiff further submitted, in support of her appeal, a statement from her husband, who has had the opportunity to observe her restrictions and limitations first-hand and described them at length.

55.   Further in support of her appeal, Plaintiff submitted a letter from Dr. Leventhal, the Neuropsychologist who performed Plaintiff's testing in March 2014.   Dr. Levanthal is an authority on the neuropsychological manifestation of tick-borne diseases and infection-induced encephalopathy, like the Plaintiff's in this case, and has presented her findings at numerous medical conferences.   Dr. Leventhal's letter to Unum, dated August 26, 2015, refuted the conclusions of Unum's neuropsychological examiner, Dr. Barr.   Dr. Leventhal's letter highlights the fact that Dr. Barr specializes in sports concussions and has no expertise in the neurocognitive impairments and neuropsychological test patterns commonly seen in individuals with Lyme encephalopathy.

56.   In response to Plaintiff's appeal, Unum conducted only one in-house physician review of records, performed by Neurologist, Dr. Jacqueline Crawford on or about November 5, 2015.  No neuropsychologist reviewed Dr. Leventhal's report, nor did Unum request clarification from Dr. Barr regarding the points raised by Dr. Leventhal.

57.   Unum's on-site physician, Dr. Crawford's report includes factual inaccuracies and clear errors.   For example, Dr. Crawford wrote in her November 5, 2015 report that she had reviewed "SSDI records."   Yet in Unum's denial letters, Unum states it does not give significant weight to the Social Security Administration's ("SSA") finding that Plaintiff is totally disabled because it did not have access to the SSA's records.   The SSA found Plaintiff totally disabled, not only from her regular occupation, but from any gainful occupation.

58. Worse, Dr. Crawford reviewed Unum's internet "research" and opined based on incorrect information, which Unum failed to validate, and which Dr. Crawford accepted as fact. Dr. Crawford wrote, "New BRI evidence indicates the insured formed a business in 2013 and secured a loan from a company which sells tractors. Formation of a business requires attention to detail, planning, memory and problem solving." Plaintiff did not form any business in 2013. Dr. Crawford also opined Plaintiff is not disabled based on Facebook postings about Plaintiff's alleged "participation" in events sponsored by the Kenneth Tietjen Memorial Foundation. This is a charitable organization Plaintiff formed prior to her disability, to honor her brother, a police officer who was killed in the line of duty on September 11, 2001, at the World Trade Center. Since the onset of her disability, Plaintiff's involvement in this foundation has been minimal.

59. Furthermore, Unum's on-site physician, Dr. Crawford, dismissed the opinions of three attending physicians who support Plaintiff's claim – Doctors Zimmerman, Fein, and Branfield – because they were "based in part upon insured's reported symptoms." Dr. Crawford ignored the fact that Plaintiff's medical records contain objective medical evidence outlined in her appeal, that the patient's report of symptoms is a normal part of the medical examination, and that Plaintiff's physicians primarily based their opinions on actual physical examination and testing. Thus, in upholding its denial based on Dr. Crawford's opinion, Unum violated the terms of of its Regulatory Settlement Agreement (RSA), section B.3. (c)(i), under which Unum is required to give significant weight to the opinions of attending physicians.

60. In addition, Unum's on-site physician, Dr. Crawford, opined Plaintiff is not disabled under the Plan because she finds there is no definitive diagnosis of Lyme disease, notwithstanding the evidence cited by her treating and examining physicians. The Plan does not require a definitive diagnosis in order to be disabled, even under the "self-reported" limitation.

21

61.    Ultimately Unum's on-site physician, Dr. Crawford, opined Plaintiff is not disabled by infection because of the expected outcomes of her treatment, rather than the actual outcome thereof.  Dr. Crawford wrote, "Even if the insured had a cerebral infection with Lyme, Babesia, or Bartonella, the extraordinary duration of treatment with antibiotics over several years would have eliminated such infections."  The Plan does not define disability based on the expected duration of a sickness or injury, or the expected outcome of treatment therefor; rather, the Plan defines disability based on the claimant's actual sickness or injury.  Here, Plaintiff's updated lab reports and medical records submitted on appeal support her claim of continued disability, as defined in the Plan.

62.    On September 18, 2015, UNUM conducted a vocational analysis which identified the physical demands of Plaintiff's occupation as "sedentary" despite admitting her occupation requires travel.  The report further states, "Non-exertional demands were not included in this assessment as none were presented as restrictions and limitations as of the date of this assessment," despite this Plaintiff's disability involving significant neurocognitive documented by Dr. Leventhal.

63.    On November 19, 2015, UNUM upheld its denial of benefits under the Plan.  Unum's decision was primarily based on, and its letter quotes extensively from, the report of its on-site physician, Dr. Crawford.  Yet in this denial letter, UNUM failed to identify Dr. Crawford pursuant to 29 CFR § 2560.503-1(h)(3)(iv), which requires UNUM to "[p]rovide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination."  Instead, in the letter, Unum refers

to Dr. Crawford as its unidentified "reviewing neurologist." Similarly, Unum failed to identify its vocational consultants, whose opinions Unum cited in the letter as further basis for the denial.

64. To date, Plaintiff continues to receive treatment for Lyme disease, including, without limitation, IVIG therapy, which has been approved and covered as medically necessary through her healthcare insurance.

65. UNUM's decision to deny disability insurance benefits was wrongful and contrary to the terms of the Plan based upon the substantial medical evidence in the possession of UNUM at the time of the denials, as well as UNUM's failure to follow its own internal claims administration policies and procedures specifying that the "Self-Reported Symptoms" limitation does not apply to claims arising from policies administered in New York. ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon a plan administrator, namely, that the administrator discharge its duties in respect to discretionary claims processing solely in the interests of the participants and beneficiaries of the plan, and it underscores the particular importance of accurate claims processing by insisting that administrators provide a "full and fair review" of claim denials.

## UNUM'S CONFLICT OF INTEREST

66. At all relevant times, UNUM has been operating under an inherent and structural conflict of interest because, on the one hand, UNUM is liable for benefit payments due to Plaintiff and, on the other hand, each payment issued depletes UNUM's assets.

67. UNUM's determination was influenced by this conflict of interest.

68. UNUM pays substantial sums of money to its medical consultants and medical examinations, either in-house or through third-party consulting agencies, to conduct reviews and examinations for UNUM's insureds.

23

69.    Because the medical consultants derive substantial income from performing file reviews for UNUM's insureds, the medical consultants have an incentive to provide file reviews that UNUM deems favorable in order to perform future file reviews for UNUM.

70.    Here, UNUM based its denial on the opinions of medical consultants and examiners employed by UNUM who were operating under a conflict of interest.  UNUM based its ultimate denial on a non-examining physician consultant whose opinion was predicated on the expected duration of disability and based on expected treatment outcomes, which is not the definition of disability in the Plan, instead of the Plaintiff's actual disability documented in the medical records.

71.    UNUM has also failed to take active steps to reduce potential bias and to promote accuracy of its benefits determinations.

## COUNT I

72.    Plaintiff repeats and re-alleges the allegation set forth in paragraphs 1 through 71 above.

73.    Unum had no legal basis for denying Plaintiff's benefits.

74.    Under the terms of the Plan, UNUM agreed to provide Plaintiff with certain disability insurance benefits in accordance with the terms and conditions set forth.

75.    To date, UNUM has failed and refused to pay Plaintiff the benefits to which she is rightfully entitled from on or about February 27, 2015 through the present.

76.    Plaintiff has satisfied all conditions precedent under the LTD Plan and is thus eligible to receive benefits.

77.    UNUM's determination the Plaintiff is not totally disabled within the meaning of the Plan is contrary to the terms of the Plan, contrary to the medical evidence, unreasonable, and an abuse of discretion.

78.    UNUM has financial conflicts of interest with respect to handling, monitoring, and eventually terminating Plaintiff's disability benefits.UNUM has financial conflicts interest, as both the administrator of the Plan and the payor of benefits thereunder, when deciding to terminate Plaintiff's disability benefits.

79.    UNUM engaged in unlawful behavior to deny Plaintiff's benefits, as evidenced by the following without limitation:

a.    Denying benefit payments to Plaintiff at a time when it knew that she was entitled to said benefits under the terms of the LTD Plan, in bad faith and contrary to the Plan;

b.    Unreasonably withholding payments from Plaintiff knowing her claims for benefits were valid;

c.    Unreasonably failing to pay benefits without having any evidence, substantial or otherwise, supporting its decision to deny benefits;

d.    Failing to provide medical consultants in the correct specialties to review the medical records in the claim file;

e.    Relying on a non-examining neuropsychologist to deny a claim supported by the treating physician;

f.    Failing to assess the claimant's regular occupation, as defined in the Plan, to include both exertional and non-exertional or cognitive demands;

g.  Relying on the opinion of a physician consultant to uphold the denial, when said physician consultant's report includes factual errors and inaccurate internet "research";

h.  Failing to identify the medical and vocational consultants who reviewed Plaintiff's records;

i.  Selectively highlighting certain factors in medical or reviewing reports in order to cast a favorable light on its position, while ignoring the conclusions of Plaintiff's treating physicians regarding the conditions for which they render treatment;

j.  Basing its denial on the opinions of medical consultants and examiners employed by UNUM and, therefore, operating under a conflict of interest;

k.  Basing its ultimate denial on a non-examining physician consultant whose opinion was predicated on the expected duration of disability and based on expected treatment outcomes, which is not the definition of disability in the Plan, instead of the Plaintiff's actual disability documented in the medical records.

l.  Ignoring the opinions of Plaintiff's board certified treating physicians and/or misrepresented the opinions of Plaintiff's treating physicians whose opinions supported disability and were based on substantial evidence in the claim file.

m.  Ignoring documentation that Plaintiff's physician had personally witnessed a seizure.

n.  Ignoring documentation that Plaintiff's physician had personally identified a Lyme "bullseye" rash.

o.  Disregarding Plaintiff's treating physicians' assessment of Plaintiff's medical condition and how it restricts and limits her from performing any occupation without any basis for doing do in violation of 29 C.F.R. § 2560.503-1(h)(2)(iv);

p.  Disregarding Plaintiff's subjective complaints, her own assessment of his medical condition, and how it restricts and limits her from performing work functions in violation of 29 C.F.R. §2560.503-1(h)(2)(iv);

q.  Failing to follow its own internal claims administration policies and procedures, which specify that the "Self-Reported Symptoms" limitation does not apply to claims arising policies administered in New York.

r.  Engaging in a pattern of procedural irregularities in order to advance its own corporate interests in terminating benefits, to the detriment of Plan participants;

s.  Failing to provide a "full and fair review" as it was obligated to do pursuant to 29 C.F.R. §2560.503-1(h)(4);

t.  Failing to maintain and utilize "reasonable claims procedures" as it was obligated to do pursuant to 29 CFR § 2560.503-1(b), in violation of ERISA;

u.  Consistently acting in its own corporate interests instead of those of the LTD Plan and its participants; and

80.   UNUM breached its fiduciary duty by failing to fairly review and reasonably interpret the reports prepared by Plaintiff's treating physicians, and failing to consider material relevant to her medical condition.   Instead, UNUM created an artificial reason for denying Plaintiff's disability benefits.   UNUM selectively highlighted certain factors in medical reports to

cast a favorable light on its position while ignoring the conclusions of Plaintiff's treating doctors regarding the condition for which they rendered treatment.

81.    UNUM breaches its fiduciary duty by failing to follow its own internal policies and procedures with respect to the inability of the "Self-Reported Symptoms" limitation to claims arising from policies administered in New York.

82.    UNUM breached its fiduciary duty to Plaintiff by placing its financial interests in reducing its expenses and increasing its profitability above Plaintiff's interests under the LTD Plan to receive disability benefits.

83.    A "higher than marketplace" quality standard, as set forth in *Metropolitan Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008), applies to evaluating the actions of UNUM in this case.

84.    UNUM was required to discharge its duties "solely in the interests of the participants and beneficiaries of the plan."

85.    UNUM violated the higher-than-marketplace standards that ERISA imposes on insurers.

86.    Plaintiff has been forced to bring the instant action as a direct result of UNUM's unlawful denial and violations of the Plan and ERISA.

87.    As a direct and proximate result of UNUM's failure to provide Plaintiff with disability benefits, Plaintiff has been deprived of said disability benefits beginning on or about February 27, 2015, to the present date.

88.    Under 29 U.S.C. § 1132(a)(1)(B), Plaintiff is entitled to recover disability benefits under the Plan that have not been paid to date  and those that will become due in the future, as well as any other benefits and reimbursements that she may entitled to by virtue of her entitlement to disability benefits under the Plan, including those related to life insurance,

together with interest thereon.

## COUNT II

89.   Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 88 above.

90.   By reason of UNUM's failure to pay Plaintiff long term disability benefits as due under the terms of the LTD Plan, Plaintiff has been forced to retain attorneys to recover such benefits, for which Plaintiff has and will continue to incur attorney's fees.

91.   Plaintiff is entitled to recover reasonable attorney's fees and the costs of this action, pursuant to Section 502(g)(1) of ERISA, 29 U.S.C. § 1132(g)(1), with interest thereon.

## COUNT III

92.   Plaintiff repeats and re-alleges the allegations set forth in paragraphs 1 through 91 above.

93.   A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the Plan.

94.   Plaintiff seeks the declaration of this Court that she meets the Plan definition of disability and consequently she is entitled to all benefits from the Plan to which she might be entitled while receiving disability benefits, including continuation of her life insurance coverage provided under the Plan, and reimbursement of all expenses and premiums paid for such benefits from the termination of benefits to the present, together with interest thereon.

95.   In the alternative, Plaintiff seeks a remand for a determination of Plaintiff's claim consistent with the terms of the Plan.

WHEREFORE, Plaintiff demands judgment against UNUM as follows:

96.   An award of benefits in the amount not paid Plaintiff beginning on or about

February 27, 2015, together with interest at the legal rate on each monthly payment from the date it became due until the date it is paid;

97.   Continuation of life insurance coverage provided under the Plan and all other benefits from the Plan to which she might be entitled while receiving disability benefits, including reimbursement of all expenses and premiums paid for such benefits, together with interest thereon.

98.   Clarifying and declaring that the Plan is obligated to pay Plaintiff long term disability benefits in the future as required by the Plan;

99.   An order determining Plaintiff is entitled to future disability benefits so long as he remains disabled as defined in the Plan;

100.  For reasonable attorney fees incurred in this action; and

101.  For such other and further relief as the Court deems just and proper.


Dated:       September 8, 2016
             New York, New York

                          _/s/ Scott M. Riemer_____
                          Scott M. Riemer (SR 5005)
                          RIEMER & ASSOCIATES, LLC
                          Attorneys for Plaintiff
                          60 East 42nd Street, Suite 1750
                          New York, New York 10165
                          (212) 297-0700
                          sriemer@riemerlawfirm.com